**Harold Dean BLOUNT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01-81-0378-CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

March 18, 1982.

Discretionary Review Refused
June 9, 1982.

Michael Hinton, Houston, for appellant.
Larry Urquhart, Houston, for appellee.

Before EVANS, C. J., and DOYLE and STILLEY, JJ.

EVANS, Chief Justice.

After a jury trial, the appellant was convicted of murder, which conviction was enhanced by a previous felony, and he was sentenced by the court to sixteen years imprisonment.

In his first ground of error, the appellant contends that the State's evidence, being entirely circumstantial, is insufficient to support the jury's verdict that he murdered the deceased.

The murder victim was the managing partner of a beauty shop which he and his brother owned. On Friday, March 28, 1980, the deceased left his shop about 12:35 p. m. and was expected to return for a 3:30 p. m. appointment. The next morning, Saturday, he did not appear at the shop, and neither his brother nor his mother could locate him at his apartment or elsewhere. Four days later, on April 1, 1980, a body wrapped in a piece of scrap carpet was noticed lying on a trash dump in Northeast Houston. After the police were notified, the body was identified as that of the victim. The body was clothed with the same shirt and red scarf

that the deceased had worn when he left the beauty shop the previous Friday, and it was unclothed from the waist down. The deceased was a homosexual, and he made no effort to hide that fact.

The county medical examiner testified that an autopsy was performed on the deceased's body on April 3, 1980, and that, in his opinion, the deceased died as a result of asphyxiation due to strangulation by unknown means. He further testified that the condition of the body was consistent with death occurring anywhere from March 28, 1980, up until April 1, 1980.

About 1:30 p. m. on Friday, March 28, 1980, approximately one hour after the deceased left his beauty shop, the appellant's next door neighbor saw someone drive a car to the appellant's house and park it on the street in front of his house. She testified that two persons were in the car, and the appellant got out of the car on the passenger side. The driver of the car had the same body build as the deceased, and he wore a red shirt and red scarf of the same color and type as the clothing found on the deceased's body. The neighbor at first thought the driver was a woman, but she later saw that the driver was a man. Thirty minutes later, she noticed that the car was still parked there, and she again noticed the car at ten o'clock that evening. The next morning the car was gone, and she did not see it again until April 1, when she saw the appellant, accompanied by three other men, get into it and drive it away. She testified that on earlier occasions the appellant had driven his own truck.

A close friend of the deceased testified that on the morning of March 30, he had used the deceased's car to run an errand. He said he saw the car twice on the following day, and the person driving the car was similar to the appellant. He also testified that he had occasion to look into the trunk of the car, and that the trunk was "fairly empty," containing only some bottles and the spare tire.

On the 28th or 29th of March, the appellant, a used carpet dealer, drove a car matching the description of the deceased's car to the Factory Carpet Outlet to obtain some used carpet. The appellant had frequently picked up carpet at the store, and he generally drove a pickup truck. When old carpet was thrown away by the store, it was placed in a dumpster in back of the warehouse, and the appellant would come and look it over, select what was good enough, and take it away. He had done this on ten or fifteen occasions. On the date in question, the warehouse supervisor suggested that the carpet be put in the trunk of the car, but the appellant replied that he had "something in there" and told the manager to "just put it in the back seat." The appellant returned several days later in the same car to see if there was any more carpet available.

Other witnesses testified that they had seen the appellant alone on March 30, 1980, driving the deceased's automobile.

On April 10, 1980, the appellant drove the deceased's car to the home of a woman who had talked to him about buying some carpet. They went to the appellant's house together. Later, she took his car keys, left his house, and drove the deceased's car to her sister's house. She subsequently called the police, who went to the appellant's house at 5:00 a. m. the following morning. When the police officers knocked on the door, the appellant looked out, saw them, and attempted to flee through a back window. The police then searched the appellant's house and found keys to the deceased's apartment. They also obtained the appellant's palm prints from the hood of the deceased's vehicle and his fingerprints from the outside of the driver's window, as well as from a spiral notebook in the trunk of the car. The license plates on the vehicle had been changed.

In reviewing a conviction based upon circumstantial evidence, this court is guided by the rules set forth in *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Cr.App.1977):

It is well established that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis

except that of the guilt and proof amounting only to a strong suspicion is insufficient. *Moore v. State,* 532 S.W.2d 333 (Tex.Cr.App.1976); *Higgins v. State,* 515 S.W.2d 268 (Tex.Cr.App.1974); *Indo v. State,* 502 S.W.2d 166 (Tex.Cr.App. 1973); *Flores v. State,* 489 S.W.2d 901 (Tex.Cr.App.1973); *Culmore v. State,* 447 S.W.2d 915 (Tex.Cr.App.1969).

In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. See *Mills v. State,* 508 S.W.2d 823 (Tex.Cr.App.1974); *Herndon v. State,* 543 S.W.2d 109 (Tex.Cr.App. 1976). The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Jones v. State,* 442 S.W.2d 698 (Tex.Cr.App. 1969); *Taylor v. State,* 87 Tex.Cr.R. 330, 221 S.W. 611, 615 (1920).

It is the appellant's position that the evidence raises a reasonable hypothesis that someone other than the appellant could have murdered the deceased. The appellant points to testimony indicating that the deceased could still have been alive on April 1, 1980; that three unidentified men in addition to the appellant, were seen in the appellant's car on that date; and that identifiable but unidentified fingerprints were found on the victim's car, which were not those of the appellant. Thus, the appellant argues that in the absence of any definable motive for the murder, the evidence is as equally consistent with appellant's innocence as it is with his guilt.

In support of this contention, the appellant relies principally upon the case of *Nathan v. State,* 611 S.W.2d 69 (Tex.Cr.App. 1981). In that case, the victim disappeared in October 1972 and his body was not discovered until some four and one-half years later in an isolated coastal area. On the date of his disappearance, the victim told a witness that he was going to see the defendant to collect a debt, and "... he was tired of fooling around and wanted his money." The victim and the defendant were later seen in the defendant's car that same morning, and in the early afternoon the defendant, a bus driver, called in and said he could not work that afternoon. That evening, when the victim did not return home, his family became worried, and their calls led to the defendant, who told searchers that he had last seen the victim working on his car at a local church. The defendant and others went to the church, where they found the victim's car in working order, but did not find the victim. There was testimony that the defendant acted in a nervous and strange manner, and that after a few days he did not maintain contact with the victim's family, although previously he had been a good friend. According to a police officer, the defendant had accounted for blood stains on the back seat of his automobile by saying that he had been rabbit hunting and thrown a rabbit over into the back seat. Upon inspection, the car seats appeared to have been washed and wiped clean, and had the appearance of water or some fluid having been used to clean them. Human blood was found on a section of the floor carpet. There was no record of the victim's blood, so there could be no match up between his blood and the blood found in the defendant's car. Another witness testified that she had wanted to terminate her relationship with the defendant, who had remarked: "I got rid of one person and I can get rid of another one." There was also evidence that the billfold of the victim, in which he normally carried two to three hundred dollars in cash, was not found on his remains, and that although the defendant had been unable to pay the full amount of his motel bill two days before the victim's disappearance, he spent $271.40 in cash to pay various bills in the three days immediately following the victim's disap-

pearance. The defense offered testimony of the defendant's wife that his grandson had fallen and cut his head, and that the blood in the back seat of the car was due to the boy having bled profusely; that the defendant was home on the afternoon of the day that the deceased disappeared; that the defendant's wife was working, and that together she and the defendant made sufficient money to pay their bills; and that she had been paid on October 5, 1972. The defense also offered evidence that the deceased usually carried large sums of cash, a fact well known to others, so that he could have been killed by any number of people. In reversing Nathan's conviction, the Court of Criminal Appeals stated:

There can be no question that there are damaging and suspicious circumstances against the appellant. He was the last person seen with the deceased; he had slightly more money in the few days after the deceased's disappearance than could be accounted for by his and his wife's salaries; he apparently lied to the officers when he said the blood in the car was rabbit blood, etc. We need not reiterate all the testimony.

Applying, however, the rules set forth in *Flores v. State, supra,* we conclude that while the circumstances of the instant case lead to a strong suspicion or probability that the appellant committed the murder, it does not exclude to a moral certainty every other reasonable hypothesis except appellant's guilt as required by the law of circumstantial evidence. We hold that the evidence is insufficient to sustain the conviction.

The facts in the case at bar are similar to those set forth in *Flores* and *Nathan;* however, in the case at bar there is a combination of factual circumstances distinguishing it from those and other cases relied on by the appellant. In *Flores,* as in the instant case, the accused was found in recent unexplained possession of the victim's stolen property; however, in that case, there was no other evidence linking the accused with the victim at the time of the murder, and there was testimony indicating that several other persons were seen with him shortly prior to his disappearance, any one of whom could have been responsible for the crime. In *Nathan,* as in the case at bar, there was testimony placing the accused with the victim on the day of his disappearance, as well as other evidence from which his guilt might be inferred. However, there was also testimony from which a trier of fact could reasonably have inferred that persons other than the accused might have murdered the deceased.

This court recognizes that the appellant's recent unexplained possession of the deceased's property is insufficient, in itself, to support a conviction for murder. *Flores v. State,* 551 S.W.2d 364, 369. However, that circumstance was coupled with other evidence: (1) appellant was the last person seen with the victim on the date of his disappearance; (2) the victim was probably murdered that same day, as indicated by his clothing and the condition of his body; (3) there was no evidence showing that some other person had opportunity and reason to kill the deceased; (4) the body was wrapped in a piece of scrap carpet; and (5) the appellant attempted to flee when encountered by the police. These facts suggest only one "reasonable" hypothesis: the murder of the deceased by the appellant.

As stated in *Flores,* and reiterated in *Nathan,* each case must be tested by its own facts. A review of the facts set forth in the record reflects that the evidence is sufficient to support the jury's verdict. Therefore, the appellant's first ground of error is overruled.

■ In his second ground of error, the appellant contends that the trial court committed reversible error by overruling his objection to the testimony of the female witness concerning the events on April 10, 1980, which led to his arrest. The witness testified that she first met the appellant on March 30, 1980, when he was driving his truck through her neighborhood, selling carpet. She later saw him driving a car similar to the victim's, and she took down the license number, which she subsequently turned over to the Houston police. On

April 10, 1980, she drove with the appellant from her home to his home in a vehicle identified as belonging to the deceased. The witness was then asked if something happened at the appellant's home that evening which upset and frightened her. An objection was made and sustained to the question, and she was examined outside the jury's presence. She testified that she became scared at the appellant's house and left while he was asleep by removing the car keys from his pocket and driving the deceased's vehicle to her sister's house. There, she called the police, who came to that location and took custody of the car. The appellant then objected that such testimony brought an extraneous offense before the jury, and the objection being overruled, the witness was permitted to testify before the jury as follows:

Q. Ma'am, after you arrived at the defendant's house, did something happen there at that location?

A. Yes.

Q. As a result of what happened, did it have some effect on the way you felt?

A. Yes.

Q. Could you tell us what feelings you had at that time after—after that happened, how you felt?

A. Scared.

Q. What did you do as a result of being scared there when you were in the house?

A. All I could think of was trying to get out.

Q. Did you leave the house then?

A. Yes. I tried the front door and couldn't get it open.

Q. Why not?

A. It seemed like it was nailed from the outside. And I was scared to go to the back door because he had a dog on the porch.

Q. Did you leave the location alone or with someone?

A. Alone.

Q. Where was Mr. Blount at the time that you left?

A. In the bed asleep.

Q. Now, what means of transportation did you use to leave his house?

A. His car.

Q. Did you get the keys to his car?

A. Yes.

Q. Where did you get the keys to his car, ma'am?

A. Out of his pants pocket, and his pants was on the dresser.

Q. Now, where did you go after you left?

A. Straight to my sister's house.

Q. Did she live somewhere in that general area?

A. No. She lived in Studewood.

Q. When you arrived there at your sister's house, what did you do?

A. I woke her up and told her everything that happened. And I said: "Am I supposed to call the police now?" She said: "Sure." So I called them.

Q. Did the police come out there to that location?

A. Yes, they did.

Q. Did you at that time talk with them and point out the vehicle you came there in?

A. Yes.

Q. Is that the same vehicle which is marked again in State's Exhibit No. 2?

A. Yes, that is the same vehicle.

The appellant argues that this testimony was improper because it indicated that the appellant had committed a crime of some nature against the witness during the time she was at his home, leaving the jury with the impression that he had committed an extraneous offense.

This ground of error is overruled. The nature of the matter which caused the witness to become "scared" is not reflected by the record, and there is nothing for this court to review.

■ In his third ground of error, the appellant contends that the trial court committed reversible error in overruling his objection to testimony of a female witness regarding the appellant's stated desire to engage in homosexual conduct. The witness was permitted to testify that during a

conversation with the appellant some six months prior to the deceased's murder, the appellant, with whom she had previously been intimate, asked her in a teasing manner if she wanted to "make love." Upon receiving a negative response from her, he stated: "I would just as soon get a man. Do you know where you can find me a man. You don't love me, I guess. I'll have to get me a man." The appellant contends that this testimony, admitted over his objection, attributed to him the intent and desire to engage in homosexual intercourse, a crime prohibited by Section 21.06 of the Texas Penal Code. The State responds with argument that the testimony showed, at most, that appellant had expressed a desire to engage in meeting a homosexual, and that only the act of homosexual intercourse is an offense under the Penal Code.

A review of the testimony of this witness indicates that she was extremely disoriented and confused, and her testimony was so discredited on cross-examination that it is extremely doubtful the jury would have given any credence to her story. The record does not indicate that the admitted testimony resulted in such harm or prejudice to the appellant that a new trial should be ordered. Accordingly, this ground of error is overruled.

The judgment of the trial court is affirmed.